FILED

NOV 2 3 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TYRONE BLOCKER,
         Plaintiff,

                                               CV 08-1196-PK

                                               FINDINGS AND
v.                                             RECOMMENDATION

WELLS FARGO BANK,
         Defendant.

PAPAK, Magistrate Judge:

      Plaintiff *pro se* Tyrone Blocker filed this action against defendant Wells Fargo Bank[1] on

October 14, 2008, alleging Wells Fargo's liability for racial discrimination and harassment

pursuant to 42 U.S.C. §§ 1983 and 1985. On June 2, 2009, Blocker amended his complaint to

allege Wells Fargo's liability for racial discrimination under 42 U.S.C. §§ 1981, 1982, and 2000a,

for intentional infliction of emotional distress, for fraud, for invasion of privacy, for defamation

of Blocker's business, and for defamation of Blocker in his own person. On that same date, I

recommended that his claims for fraud and invasion of privacy be dismissed with prejudice and

that his claims for violation of 42 U.S.C. § 2000a and for defamation of Blocker's business be

---

[1] The correct name of the entity served with summons in this action is Wells Fargo Bank
Northwest, N.A.

Page 1 - FINDINGS AND RECOMMENDATION

dismissed without prejudice.  On September 1, 2009, Judge Haggerty adopted my

recommendations, with the sole modification that Blocker's claims for fraud and invasion of

privacy be dismissed without prejudice.[2]  On September 15, 2009, Wells Fargo answered

Blocker's amended complaint and filed a counterclaim for prevailing-party attorney fees pursuant

to 42 U.S.C. § 1988(b), characterizing Blocker's claims as "frivolous, unreasonable, or

groundless."

Now before the court is Wells Fargo's motion (#89) for summary judgment.  I have

considered the parties' motions and all of the pleadings on file.  For the reasons set forth below,

the motion should be granted in part and denied in part as discussed below.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues

exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996).  In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving

party, and may neither make credibility determinations nor perform any weighing of the

---

[2] Judge Haggerty dismissed Blocker's claims of fraud and invasion of privacy without
prejudice based on Blocker's representation that he could cure the defects in his pleading of those
claims by amendment.  Blocker did not subsequently seek leave to amend his pleading, and those
claims are not currently before the court.

evidence. *See, e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

On September 18, 2007, plaintiff Blocker opened a personal checking account (the "account") with defendant Wells Fargo, a national banking association. *See* Declaration of Carole Byrum ("Byrum Decl."), ¶ 3; *see also* Byrum Decl., Exh. 1 ("Consumer Account Application") at 1. The terms and conditions of the parties' banking relationship and of the parties' rights and obligations in connection with the account were governed by a Consumer Account Agreement (the "Agreement"). *See* Byrum Decl., ¶ 4; *see also* Agreement, Byrum Decl., Exh. 2. The Agreement provided Wells Fargo with an express contractual right to freeze Blocker's account and the funds it contained under specified circumstances, as follows:

> As part of the Bank's loss prevention program, when the Bank suspects that irregular, unauthorized, or unlawful activities may be involved with [Blocker's] Account, the Bank may "freeze" (or place a hold on) the balance in [the] Account . . . pending an investigation of such suspected activities.

Agreement, p. 17. In addition, in the event any third party made any claim on any of the funds contained within the account, the Agreement provided Wells Fargo with an express right to take a range of actions in response, including freezing the account or closing it:

> If any person or entity makes a claim against funds in [Blocker's] Account. . . , the Bank, without any liability to [Blocker], may take one or more of the following actions: . . . freeze all or a part of the funds in [the] Account until the dispute is resolved to the bank's satisfaction; [or] close [the] Account and send a check for the available balance in [the] Account payable to [Blocker] . . . .

Agreement, p. 16. The Agreement further provided that Wells Fargo would not provide any information to any third party regarding Blocker's account without Blocker's consent except

Page 3 - FINDINGS AND RECOMMENDATION

under specifically enumerated circumstances, including "when the Bank determines that

disclosure is necessary or appropriate in order to complete a transaction" and "when the bank

concludes that disclosure is necessary to protect . . . the interests of the Bank." Agreement, p. 37-

38. The Agreement further provided that Blocker had an obligation to promptly review his bank

statements, and provided that his failure to advise Wells Fargo within 30 days of any credit or

refund due to him in consequence of any "erroneous or unauthorized debit, a missing signature,

an unauthorized signature, or an alteration," or within six months of any credit or refund due to

him in consequence of any "forged, unauthorized, or missing endorsement," would result in loss

of the right to the credit or refund. *See* Agreement, p. 11-12.

Between February 8, 2008 and March 10, 2008, the Internal Revenue Service made eight

deposits of tax refunds in the names of third parties into Blocker's account. By March 10, 2008,

the I.R.S. had recalled one of those eight deposits. Wells Fargo froze Blocker's account effective

March 10, 2008. Wells Fargo made telephone calls to all of the contact numbers it had on file

for Blocker, but was unable to reach him due to the fact that Blocker was at that time

incarcerated. Wells Fargo sent a letter to Blocker's last known address to advise him that his

account had been frozen.

Between March 10, 2008, and May 29, 2008, the I.R.S. deposited two additional third-

party tax refunds into Blocker's account. Ultimately, the I.R.S. recalled five of the ten third-party

tax refund deposits.

In or around February or March 2008, Blocker's mother and sister attempted to withdraw

funds from Blocker's account at one of Wells Fargo's branches in Salem, OR. According to the

declarations of Blocker's mother and sister, the manager of the branch advised them that Blocker

Page 4 - FINDINGS AND RECOMMENDATION

was "in big trouble" because of the third-party tax refund deposits made to his account, and that the account had been frozen pending an investigation into possible fraud.

Between March and October 2008, several persons identifying themselves as clients of Blocker's tax consultation business made inquiries of Wells Fargo regarding Blocker's account and their tax refund checks. Wells Fargo advised all such persons that Blocker's account had been frozen pending an investigation into possible fraud, and that they should contact the I.R.S. to request that the deposits to Blocker's account be recalled so that new refund checks could issue.

On October 8, 2008 Blocker's account was formally closed and the remaining balance of $983.99 was mailed to Blocker. Blocker received Wells Fargo's check in that amount. Blocker filed this action on October 14, 2008.

## ANALYSIS

Blocker's currently pending claims in this action are for alleged racial discrimination under 42 U.S.C. §§ 1981 and 1982, intentional infliction of emotional distress, and defamation. In addition to Blocker's claims, also pending in this action is Wells Fargo's counterclaim for prevailing party attorney fees and costs pursuant to 42 U.S.C. § 1988. Wells Fargo moves for summary judgment as to each of Blocker's claims and as to its own counterclaim.

## I.    Blocker's Unauthorized Filing at Docket No. 116, Dated September 29, 2010

On September 29, 2010, Blocker filed a document with the court styled as his "Fourth Amended Complaint." *See* Docket No. 116. As of that date, Wells Fargo had filed an answer to Blocker's pleading in this action, and Wells Fargo's motion for summary judgment, as well as Blocker's opposition to it, had already been filed. Blocker did not move for leave of court to

amend his pleading before filing the document.

Federal Civil Procedure Rule 15(a) provides that a party may amend its pleading as a matter of course at any time within 21 days after service of an opposing party's responsive pleading or motion to dismiss under Federal Civil Procedure Rule 12(b), (e), or (f), and otherwise may only amend its pleading with the other party's consent or after first obtaining leave of court to do so. *See* Fed. R. Civ. P. 15(a). This court has previously had occasion to advise Blocker that a document filed purportedly as an amended pleading more than 21 days after service of a Rule 12(b) motion to dismiss was "a procedural nonentity, ineffective under the Federal Rules of Civil Procedure to state any claim as to which judgment could be entered." Docket No. 39. Moreover, even had Blocker moved for leave to amend his pleading, the decisions of the Ninth Circuit make clear that "[a] motion for leave to amend is not a vehicle to circumvent summary judgment." *Schlacter-Jones v. General Tel.*, 936 F.2d 435, 443 (9th Cir. 1991); *see also, e.g.*, *Glesenkamp v. Nationwide Mutual Ins. Co.*, 71 F.R.D. 1, 4 (1974) ("The liberal amendment policy of the Federal Rules was not intended to allow a party to circumvent the effects of summary judgment by amending the complaint every time a termination of the action threatens. The time must arrive in every case when the plaintiff must demonstrate that there is a genuine issue for trial or have summary judgment entered against him"), *aff'd without opinion*, 540 F.2d 458 (9th Cir. 1976) (per curiam).

I further note that Blocker's improper submission purports to allege, in addition to the claims alleged in Blocker's current pleading, claims of racial discrimination in violation of 42 U.S.C. § 2000a, unlawful discrimination in public accommodation in violation of Or. Rev. Stat. 649A.403, invasion of privacy, conversion, breach of contract, and fraud. This court has already

had occasion to dismiss with prejudice substantially identical claims for invasion of privacy and

fraud. Analysis of the putatively proposed claims under Section 2000a and Section 403 and of

the common-law claims of conversion and breach of contract establishes that leave to amend

Blocker's pleading to allege those claims would properly be denied as futile if a proper motion

for leave to amend were filed, for reasons discussed below in connection with Blocker's claims

under 42 U.S.C. §§ 1981 and 1982.

Blocker was aware of the procedural requirements for amending a pleading and failed to

comply with them. In addition, a party may not oppose entry of summary judgment by filing a

motion for leave to amend a complaint. Finally, even if it would not unduly delay resolution of

these proceedings to grant Blocker leave to amend his pleading, the putatively proposed claims

set forth in Blocker's submission fail to state any claim as to which relief could be granted. I

therefore recommend that the court treat Blocker's filing at Docket No. 116 as a procedural

nonentity, and refrain from construing it as constituting a motion for leave to amend.

## II.    Contractual Limitations Period

As noted above, Blocker had a contractual obligation to promptly review his bank

statements, and his failure to advise Wells Fargo within 30 days of any credit or refund due to

him in consequence of any "erroneous or unauthorized debit, a missing signature, an

unauthorized signature, or an alteration," or within six months of any credit or refund due to him

in consequence of any "forged, unauthorized, or missing endorsement," would result in loss of

his entitlement to the credit or refund. *See* Agreement, p. 11-12. Wells Fargo argues on the basis

of this contractual limitations period, which Wells Fargo refers to as a "statute of limitations,"

that all of Blocker's claims are time-barred. However, because none of Blocker's claims are

premised on any right to a credit or refund based on any unauthorized transaction or forged, missing, or unauthorized endorsement, Wells Fargo's contractual limitations period argument is not well taken. Wells Fargo's motion should therefore be denied to the extent it is premised on the Agreement's contractual limitations period.

**III.  Blocker's 42 U.S.C. § 1981 Claim of Racial Discrimination**

The gravamen of Blocker's 42 U.S.C. § 1981 claim is that Wells Fargo denied him the benefits of his contractual relationship with it – specifically, his contractual right to utilize banking privileges, including the right to withdraw funds from his account – on the basis of his race. Section 1981(a) provides, in relevant part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts. . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1981(b) clarifies that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

A Section 1981 claim requires that a plaintiff establish that he or she is a member of a racial minority, that the defendant intended to discriminate against the plaintiff on the basis of race, and that the discrimination involved impairment of one of the rights enumerated in the statute, including the right to make and enforce contracts. *See, e.g., Peterson v. State of California Dept. of Corrections and Rehabilitation*, 451 F. Supp. 2d 1092, 1101 (E.D. Cal. 2006), *citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.

1993); *Green v. State Bar of Tex.*, 27 F.3d 1083, 1086 (5th Cir. 1994). Any Section 1981

claimant alleging impairment of the right to make and enforce contracts must therefore "initially

identify" an impaired contractual relationship, either actual or prospective, under which the

claimant has cognizable rights. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). In

analyzing claims under Section 1981, courts use the same framework for analyzing Title VII

claims generally, including the *McDonnell-Douglas* burden-shifting approach. *See, e.g.,*

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.5 (9th Cir. 2006).

It is Blocker's position that Wells Fargo impaired his contractual rights by freezing the

assets in his account due to his race. However, the Agreement – the contract giving rise to the

relationship Blocker argues was impaired by Wells Fargo's actions – provided Wells Fargo with

an express contractual right to freeze Blocker's account in the event it "suspect[ed] that irregular,

unauthorized, or unlawful activities may be involved with" his account. *See* Agreement, p. 17.[3]

Moreover, the evidence of record establishes that between February 8, 2008, and March 10,

2008, eight tax refunds in the names of persons other than Blocker were electronically credited to

Blocker's personal checking account by the Internal Revenue Service, and that by March 10,

2008, the I.R.S. had recalled at least one of those deposits.[4] Wells Fargo has offered evidence

---

[3] The Agreement further provided Wells Fargo an express contractual right to freeze Blocker's account in the event any third party made a claim against funds in the account. *See* Agreement, p. 16. However, although Wells Fargo has offered evidence into the record that a third party – Cheryl Mohr, apparently a client of Blocker's tax consultation business – did in fact make such a claim against funds in Blocker's account, that claim was apparently made on or around April 3, 2008, after the account had already been frozen. Wells Fargo therefore may not rely on Mohr's third-party claim in support of its position that its decision to freeze Blocker's account was not actionable under Section 1981.

[4] In support of its argument that the deposit of third-party tax refund checks to Blocker's account was *per se* irregular, Wells Fargo invites this court to consider I.R.S. Publication 1345 as

that an employee in Wells Fargo's Loss Prevention department[5] noted the deposits and the recall, and referred the matter to Carole Byrum, a Wells Fargo vice president and senior fraud investigator, on or around March 10, 2008. According to Byrum's testimony, she attempted to contact Blocker using all of the contact information Wells Fargo had on file for him, but that she was unable to contact him due to the fact that Blocker was incarcerated and therefore unavailable at his contact information of record. Byrum testified that, due to "the suspicious nature of numerous third party tax refund deposits to a personal account, some of the funds having already been recalled by the depositor, and the concern that [Wells Fargo] m[ight] be exposed to a large loss because other people would be making claims for the funds," Wells Fargo froze Blocker's account effective March 10, 2008. Byrum Decl., ¶ 8.[6] The account remained frozen, and Blocker was unable to access funds deposited to the account, until Wells Fargo closed the account on October 8, 2008. At that time, Wells Fargo remitted to Blocker all funds remaining in the account. Although Blocker asserts that Wells Fargo was motivated by racial animus when

---

revised in March 2009, which indicates that professional tax preparers electronically filing their clients' tax returns who request direct deposit of refunds should not request direct deposit to any account not in the taxpayers' own names. *See* I.R.S. Publication 1345 (03-2009). However, Wells Fargo made its decision to freeze Blocker's account in March 2008, more than a year before the revised version issued, and the predecessor version of Publication 1345, revised in November 2004, contains no such proscription, *see* I.R.S. Publication 1345 (11-2004). Wells Fargo therefore may not rely on the March 2009 version of Publication 1345 in support of its position that its decision to freeze Blocker's account was not actionable under Section 1981.

[5] Wells Fargo has offered evidence into the record that the employee in question is a white woman married to an African-American man, and the mother of mixed-race children.

[6] The evidence of record establishes that between March 10, 2008, and May 19, 2008, two additional third-party tax refunds were deposited to Blocker's account. Ultimately, the I.R.S. recalled a total of five of the tax refund deposits before the account was closed and the remaining funds sent to Blocker on October 8, 2008.

it elected to freeze his account, he does not otherwise dispute any of the foregoing facts.[7]

On the undisputed facts, therefore, Blocker had no contractual right to expect Wells Fargo to refrain from freezing the funds in his account. To the contrary, Wells Fargo enjoyed an express contractual right to do so under circumstances including precisely those that Blocker's account history presented. Blocker has therefore failed to identify any impairment in his contractual relationship with Wells Fargo, and his Section 1981 claim necessarily fails as a matter of law. *See, e.g., Ahmed v. Mid-Columbia Med. Ctr.*, 673 F. Supp. 2d 1194, 1202 (D. Or. 2009).

In opposition to Wells Fargo's motion, Blocker argues that the Agreement was an unconscionable "contract of adhesion," and that the court should construe its provision conferring on Wells Fargo a right to freeze the account as unenforceable. Assuming *arguendo* that Blocker correctly characterizes the Agreement as a contract of adhesion – that is, that the contract was executed between parties of unequal bargaining power and that Blocker had no opportunity to suggest revisions to it before deciding whether or not to sign, *see Reeves v. Chem Industrial Co.*, 262 Or. 95, 101(1972) – I am unpersuaded that Blocker has established the necessary premise that the relevant provision of the Agreement is unconscionable.

In Oregon, there is no rule pursuant to which contracts of adhesion are *per se* unenforceable. To the contrary, the enforceability of such a contract necessarily depends on the question of unconscionability. *See, e.g., id.* The Oregon courts have set the parameters for the unconscionability analysis as follows:

---

[7] Moreover, Blocker expressly concedes that he has "no direct evidence of race discrimination." Docket No. 114, p. 3.

Unconscionability in Oregon, as elsewhere, has both a procedural and a substantive component. . . . Procedural unconscionability generally refers to the conditions of contract formation and

> focuses on two factors: oppression and surprise. Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the terms.

. . . Substantive unconscionability generally refers to the terms of the contract as opposed to the circumstances of formation and focuses on the one-sided nature of the substantive terms. . . .

> The primary focus appears to be relatively clear: substantial disparity in bargaining power, combined with terms that are unreasonably favorable to the party with the greater power may result in a contract or contractual provision being unconscionable. Unconscionability may involve deception, compulsion, or lack of genuine consent, although usually not to the extent that would justify rescission under the principles applicable to that remedy. The substantive fairness of the challenged terms is always an essential issue.

. . . Thus, both procedural and substantive unconscionability are relevant, although only substantive unconscionability is absolutely necessary.

*Vasquez-Lopez v. Ben. Or., Inc.*, 210 Or. App. 553, 566-567 (2007) (citations and internal quotation marks and modifications omitted). Here, Blocker argues the *procedural* unconscionability of the Agreement, but fails to adduce any evidence or argument as to the *substantive unfairness* of the relevant provisions; as noted above, substantive unfairness is the *sine qua non* of a finding of unconscionability under Oregon law. *See id.* Moreover, analysis of the provision granting Wells Fargo a right to freeze the account in the event it had reason to suspect irregular, unauthorized, or unlawful activities in connection with the account establishes that the provision is in no way unreasonably favorable to the bank. The provision gives Wells Fargo the ability to take action to protect itself from loss under circumstances giving rise to

Page 12 - FINDINGS AND RECOMMENDATION

suspicion of account-holder fraud or other malfeasance, and the contemplated action – freezing the account-holder's account – is reasonably well-tailored to the risk it is intended to minimize. In the absence of evidence sufficient to support a conclusion of substantive unconscionability, Blocker's unconscionability theory necessarily fails.

Blocker next argues that the Agreement is unenforceable because his consent to it was fraudulently obtained. Specifically, he argues that the document he signed does not "disclose" the Agreement containing the terms and conditions of his contract with Wells Fargo, and that Wells Fargo affirmatively represented to him that his signature would have the sole effect of "securing" the Personal Identification Number associated with the account.

Fraud in the inducement occurs when a party understands the subject matter of a contract, and is induced to agree to enter into the contract of the basis of another party's fraudulent misrepresentation, *e.g.*, where a party agrees to lease grazing rights from another based on the other's representation that applicable law permits grazing as specified in the parties' contract. *See Mount Joseph Cattle Co. v. Makin Farms, Inc.*, 180 Or. App. 27, 33-34 (2002). By contrast, fraud in the execution occurs when a party makes or signs an agreement without knowledge that he is entering a contract or misunderstanding the subject matter of the contract, due to another party's fraudulent misrepresentation, *e.g.*, when a party signs a lease agreement believing it to be a different document altogether. *See Berry v. Richfield Oil Corp.*, 189 Or. 568, 588-589 (Or. 1950). Both theories of contract vitiation require the propounding party to establish that his assent to the agreement in question was obtained via fraud. The elements of fraud under Oregon law are "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the

Page 13 - FINDINGS AND RECOMMENDATION

manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its

truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Webb v. Clark*,

274 Or. 387, 391 (1976); *Johnsen v. Mel-Ken Motors*, 134 Or. App. 81, 89 (1995).[8]

 Setting aside the logical incoherence of Blocker's position – namely, that he may seek

relief under Section 1981 for the alleged impairment of a contractual relationship that Blocker

argues should be set aside as fraudulently induced and/or fraudulently executed – Blocker's

theory of fraud in the execution necessarily fails, because (*inter alia*) Blocker cannot establish

that his purported reliance on Wells Fargo's alleged misrepresentation regarding the nature of the

account application Blocker signed was reasonable or otherwise as of right: first, the document

Blocker signed is clearly an application for a bank account, and neither purports to regard nor

makes any mention of any Personal Identification Number; second, Blocker's signature appears

immediately above a short paragraph containing the statement that the signatory "received a copy

of the applicable account agreement and privacy brochure" and that the signatory "agree[d] to be

bound by them." *See* Byrum Decl., Exh. 1, p. 2.    Similarly, Blocker's theory of fraud in the

inducement necessarily fails, as (*inter alia*) Blocker has not offered evidence that Wells Fargo

made any misrepresentation in reliance on which Blocker elected to enter into the Agreement.  I

therefore decline to construe the Agreement as unenforceable on the theory that Blocker's consent

to it was fraudulently obtained.

 Finally, Blocker asserts that his Section 1981 claim should survive summary judgment on

the basis of purported evidence that persons outside his protected class but otherwise similarly

---

 [8] Some Oregon courts consolidate the nine elements of a claim for fraud down to a list of
five, but the same essential requirements are present whether enumerated as five or nine
elements.

situated were not subjected to the same impairment of their contractual rights as was Blocker. In support, Blocker offers the declarations of Brandon P. Grimes and Manuel Victor, to the effect that both have permitted family members to deposit employment checks into their Wells Fargo accounts. Such evidence is insufficient to support Blocker's claims. Wells Fargo has never taken the position that anything untoward occurs when an account-holder causes third-party employment checks to be deposited in his account; to the contrary, Wells Fargo has consistently argued that it is specifically third-party tax refund checks that caused its reasonable suspicion that fraudulent or irregular activity was occurring in connection with Blocker's account.

Even assuming *arguendo* that Blocker had established an impairment of his contractual relationship with his bank, Wells Fargo has offered a legitimate, nondiscriminatory reason for its actions: namely, its good-faith suspicion that activity constituting fraud might be occurring in connection with Blocker's account. Wells Fargo has offered evidence into the record in support of this reason in the form of Carole Byrum's deposition testimony that she was unaware of Blocker's race at the time she made the decision to freeze the account, and that her decision was made instead on the basis of the eight third-party tax refund checks deposited to Blocker's account, one of which had been recalled by the I.R.S.. Under *McDonnell Douglas*, the burden is therefore on Blocker to offer evidence from which a reasonable factfinder could conclude that Wells Fargo's proffered reason is pretextual. Blocker has not met his burden to do so. As noted above, Blocker's only relevant evidence on this issue is the declaration testimony of Grimes and Victor, which does not support the conclusion that Wells Fargo treated similarly situated persons outside of Blocker's protected class differently from Blocker.

For the foregoing reasons, Blocker's Section 1981 claim necessarily fails as a matter of

Page 15 - FINDINGS AND RECOMMENDATION

law.  Wells Fargo's motion should therefore be granted as to Blocker's claim of racial

discrimination in violation of 42 U.S.C. § 1981.

**IV.    Blocker's 42 U.S.C. § 1982 Claim of Racial Discrimination**

In connection with his claim under 42 U.S.C. § 1982, Blocker asserts that Wells Fargo

impaired his property interest in his bank account and the funds therein deposited when it froze

his account on the basis of his race.  Section 1982 provides as follows:

> All citizens of the United States shall have the same right, in every State and
> Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell,
> hold, and convey real and personal property.

42 U.S.C. § 1982.  The courts construe the language of Section 1982 "to protect not merely the

enforceability of property interests acquired by black citizens but also their right to acquire and

use property on an equal basis with white citizens."  *Memphis v. Greene*, 451 U.S. 100, 120 (U.S.

1981).  Section 1982 claims, like Section 1981 claims, are analyzed under the same framework

as Title VII claims, including the *McDonnell Douglas* burden-shifting framework.  *See Phiffer v.*

*Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 551 (9th Cir. 1980).  I have previously held that

Blocker had a presumptive property interest in the funds deposited into his personal bank

account.

For reasons precisely analogous to those set forth above in connection with Blocker's

Section 1981 claim, Blocker has failed to offer evidence sufficient to support the conclusion that

Wells Fargo impaired any property interest he had in the funds in his bank account when it froze

his account.  Blocker agreed to a contract that expressly provided Wells Fargo the right to take

the action it did under the circumstances Blocker's account history presented, so that Blocker's

property interest in his account was necessarily subject to Wells Fargo's right to freeze the

account under circumstances specified in the Agreement. Thus, Wells Fargo's actions, though they may have constituted an inconvenience and source of frustration to Blocker, did not constitute an actionable impairment of his property interest.

Moreover, assuming *arguendo* that Blocker had established an impairment of his property interest in his bank account, Wells Fargo has offered into the record evidence in support of its legitimate, nondiscriminatory reason for its actions: its good-faith suspicion that activity constituting fraud might be occurring in connection with Blocker's account. Under *McDonnell Douglas*, the burden is therefore on Blocker to offer evidence from which a reasonable factfinder could conclude that Wells Fargo's proffered reason is pretextual. Blocker has not met his burden to do so. For the same reasons discussed above in connection with Blocker's Section 1981 claim, the deposition testimony of Grimes and Victor is not on point. Indeed, Blocker's only express argument that Wells Fargo's proffered reason is pretextual is that Wells Fargo's "sole purpose" in freezing his account and initiating an investigation into Blocker's account-related activities was to protect itself against the "possibility of loss" rather than to protect third parties or to "prosecute" Blocker. Blocker's argument is entirely at odds with his adopted legal position that Wells Fargo was motivated by racial animus when it froze his account, and does not constitute an argument that Wells Fargo could be liable under Section 1982.

For the foregoing reasons, Blocker's Section 1982 claim necessarily fails as a matter of law. Wells Fargo's motion should therefore be granted as to Blocker's claim of racial discrimination in violation of 42 U.S.C. § 1982.

## V.    Blocker's Claim of Intentional Infliction of Emotional Distress

It is Blocker's position that Wells Fargo committed the tort of intentional infliction of

emotional distress when it froze his account and initiated an investigation into Blocker's account-related activities and/or when it informed Blocker's clients and family members and the Internal Revenue Service that his account had been frozen pending an investigation of possible fraud. Under Oregon law, to state a claim for intentional infliction of emotional distress a plaintiff must allege that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or. 532, 543 (1995), *quoting Sheets v. Knight*, 308 Or. 220, 236 (1989). A defendant acts with intention to cause emotional distress when the defendant intends an action that the defendant knows is substantially certain to cause emotional distress. *See id.*, at 551.

The Oregon courts have held that the trial court must play a "gatekeeper role in evaluating the viability of an [intentional infliction of emotional distress] claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability." *House v. Hicks*, 218 Or. App. 348, 358 (Or. Ct. App. 2008), *citing Tenold v. Weyerhaeuser Co.*, 127 Or. App. 511, 517 (1994); *Pakos v. Clark*, 253 Or. 113 (1969). The *House* court opined that "[w]hether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances. [The courts must] consider whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences." *Id.* at 358-359 (internal quotation marks and modifications omitted), *quoting Hall v. The May Dep't. Stores*, 292 Or. 131, 137 (1981).

Page 18 - FINDINGS AND RECOMMENDATION

The most important of the contextual factors the courts must consider in evaluating whether alleged conduct may support a viable claim for intentional infliction of emotional distress is whether the parties are in a "special relationship . . . , such as an employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor or government officer-citizen [relationship], that shapes the interpersonal dynamics of the parties. *Id.* at 360. "A defendant's relationship to the plaintiff may be one that 'imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers.'" *Id., quoting McGanty*, 321 Or. at 547-48. The courts also consider whether the complained-of conduct was illegal or criminal, whether the conduct was undertaken with an "ulterior motive," whether the conduct was intended to "take advantage of an unusually vulnerable individual," and the setting in which the conduct occurred. *Id.* at 359, 360 (citations omitted).

Here, Blocker has not adduced any evidence in support of the conclusion that Wells Fargo intended to cause him to experience severe emotional distress. In consequence, his claim may only survive Wells Fargo's motion if Wells Fargo's conduct was sufficiently outrageous to create a question of fact as to its intent. *See Buckel v. Nunn*, 133 Or. App. 399, 404 (1995) (holding that "the requisite intent can be inferred from outrageous conduct"). The evidentiary record does not support the conclusion that Wells Fargo's complained-of conduct was actionably outrageous.

The outrageousness inquiry begins with analysis of the parties' relationship. Blocker and Wells Fargo were in an arm's-length contractual relationship rather than in a relationship involving structural power differentials of any kind. As such, Wells Fargo was under no

heightened duty to refrain from causing Blocker to experience distress.

As to the complained-of conduct itself, Wells Fargo's actions were not illegal or criminal, there is no evidence sufficient to support the conclusion that Wells Fargo had any ulterior motive in taking the complained-of actions, and there is no suggestion that Wells Fargo intended to take advantage of an individual it knew to be unusually vulnerable. Indeed, Wells Fargo's conduct was in no way outside the bounds of socially tolerable conduct: its actions in freezing Blocker's account and initiating its investigation were undertaken pursuant to the express provisions of its Agreement with Blocker, and its actions in advising third parties of the pending fraud investigation were, to all appearances, for the purpose of advising interested persons of the reason why the funds in the account could not be accessed.

Because, in light of all of the circumstances and all the facts in the record, Wells Fargo's actions were at all material times within the bounds of socially tolerable conduct, Blocker's claim of intentional infliction of emotional distress necessarily fails as a matter of law. Wells Fargo's motion should therefore be granted as to Blocker's claim of intentional infliction of emotional distress.

## VI.    Blocker's Defamation Claim

It is Blocker's position that Wells Fargo slandered him when it (i) told his mother and sister that he was "in big trouble" because third-party checks had been deposited to his account and that his account had been frozen pending an investigation into possible fraud, and (ii) told three of Blocker's clients that their tax returns needed to be recalled by the I.R.S. due to possible fraud. It is further Blocker's position that Wells Fargo defamed him in writing when (iii) it made internal notations to advise its employees that there was a hold on Blocker's account due to

suspicious transactions. In Oregon, "[t]he elements of a claim for defamation are: (1) the making of a defamatory statement; (2) publication of the defamatory material; and (3) a resulting special harm, unless the statement is defamatory *per se* and therefore gives rise to presumptive special harm." *Nat'l Union Fire Ins. Co. v. Starplex Corp.*, 220 Or. App. 560, 584 (Or. Ct. App. 2008), *citing L&D*, 171 Or. App. at 22. "A defamatory statement is one that would subject another to hatred, contempt or ridicule or tend to diminish the esteem, respect, goodwill or confidence in which the other is held or to excite adverse, derogatory or unpleasant feelings or opinions against the other." *Id.* (internal quotation marks and modifications omitted), *quoting Marleau v. Truck Insurance Exchange*, 333 Or. 82, 94 (2001), *quoting Reesman v. Highfill*, 327 Or. 597, 603 (1998).

"Spoken words, *i.e.*, slander, are actionable *per se* in Oregon if, among other categories of statements, they are words tending to injure the plaintiff in his or her profession or business. *Id.*, *quoting Marleau*, 333 Or. at 95. "Such words must cast aspersions on the plaintiff's ability to perform essential functions, or must assert that the plaintiff lacks a characteristic necessary to successful performance of his or her job." *Id.* at 585, *citing L&D*, 171 Or. App. at 25-26. By contrast, defamation by written publication, or libel, "is defamatory *per se*" without regard to its content. *Bock v. Zittenfield*, 66 Or. App. 97, 101 (Or. Ct. App. 1983), *quoting Newton v. Family Federal Sav. & Loan Asso.*, 48 Or. App. 373, 376 (Or. Ct. App. 1980), *citing Hinkle v. Alexander*, 244 Or. 267, 272 (1966).

"Truth is an affirmative defense to a defamation claim." *Lansford v. Georgetown Manor, Inc.*, 192 Or. App. 261, 270 ( 2004), *citing Bank of Oregon v. Independent News, Inc.*, 298 Or. 434, 437 (1985). In addition:

Page 21 - FINDINGS AND RECOMMENDATION

> An allegedly defamatory statement is subject to a qualified or conditional privilege if (1) it was made to protect the interests of the defendant; (2) it was made to protect the interests of the plaintiff's employer; or (3) it was on a subject of mutual concern to the defendant and the person to whom the statement was made.

*Id.*, quoting *Affolter v. Baugh Construction Oregon, Inc.*, 183 Or. App. 198, 204 (2002). "The burden of proving an abuse of the qualified privilege. . . rests upon the plaintiff." *Id.*, quoting *Walsh v. Consolidated Freightways, Inc.*, 278 Or. 347, 356 (1977).

Here, it is clear that Wells Fargo's internal communications to and among its employees on the subject of the hold on Blocker's account is subject to the qualified privilege, having indisputably been made to protect Wells Fargo's interests. Indeed, Blocker expressly concedes that Wells Fargo's "sole" purpose in placing the freeze and initiating the investigation was to protect itself from loss, and Wells Fargo has offered undisputed evidence to that effect into the record. Although Blocker does not expressly argue that Wells Fargo abused the privilege, his arguments in connection with his Section 1981 and Section 1982 claims can be construed as arguments that the privilege has been abused, *i.e.*, that Wells Fargo lacked a reasonable basis for believing that its statements were true and/or that it was motivated by racial animus rather than defense of its interests to make the statements. However, for the reasons discussed above, those arguments are not supported by the evidentiary record and are not well taken. Blocker's claim of defamation by publication therefore necessarily fails.

Similarly, Blocker's claim that Wells Fargo slandered him to his clients likewise necessarily fails, and for the same reasons. Potential fraud in connection with the deposit of third-party tax refunds in the names of Blocker's clients to Blocker's personal checking account was necessarily a subject of mutual concern to Wells Fargo and to Blocker's customers who

made inquiries regarding access to the funds in the account. Those communications were therefore likewise made within Wells Fargo's qualified privilege, and Blocker's claim of defamation by slander necessarily fails as to the statements made to his clients.

Finally, Blocker cannot obtain relief in connection with his claim that Wells Fargo slandered him to his mother and sister. The statement that Blocker was "in big trouble" was not itself defamatory, and the statements that third-party checks had been deposited to his account and that his account had been frozen pending an investigation into potential fraud are subject to the affirmative defense of truth.

For the foregoing reasons, each of Blocker's theories of defamation fails as a matter of law. In consequence, Wells Fargo's motion should be granted as to Blocker's defamation claim.

VII. **Wells Fargo's Counterclaim for Prevailing Party Attorney Fees**

It is Wells Fargo's position that it is entitled to its attorney fees and costs as a prevailing party in a proceeding to enforce Section 1981 and/or Section 1982, pursuant to 42 U.S.C. §1988(b). Section 1988(b) provides, in relevant part, as follows:

> In any action or proceeding to enforce a provision of sections 1981, . . . [or]1982
> . . .of this title, . . . the court, in its discretion, may allow the prevailing party,
> other than the United States, a reasonable attorney's fee as part of the costs. . . .

42 U.S.C. § 1988(b). As the Ninth Circuit has noted:

> The statute does not differentiate between a prevailing plaintiff and defendant, but
> case law has filled that gap. "[A] prevailing plaintiff 'should ordinarily recover an
> attorney's fee unless special circumstances would render such an award unjust.' "
> *Hensley v. Eckerhart*, 461 U.S. 424, 429, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983)
> (quoting S. Rep. No. 94-1011, p. 4 (1976)). Prevailing defendants, on the other
> hand, may only be awarded attorney's fees pursuant to 42 U.S.C. § 1988(b) when
> the plaintiff's civil rights claim is "frivolous, unreasonable, or groundless, or that
> the plaintiff continued to litigate after it clearly became so." *Christiansburg
> Garment Co. v. EEOC*, 434 U.S. 412, 422, 54 L. Ed. 2d 648, 98 S. Ct. 694

Page 23 - FINDINGS AND RECOMMENDATION

(1978).

*Thomas v. City of Tacoma*, 410 F.3d 644, 647-648 (9th Cir. 2005).

I am unpersuaded that Wells Fargo has established a clear entitlement to prevailing defendant fees under Section 1988(b). Blocker is a *pro se* plaintiff, and although his assertions of liability were ultimately without merit, he was able to state claims that survived Wells Fargo's motions to dismiss, and to offer colorable arguments in support of them. I therefore recommend that Wells Fargo's motion be denied as to its counterclaim for prevailing defendant fees, and that the court find in Blocker's favor on Wells Fargo's counterclaim.

## CONCLUSION

For the reasons set forth above, I recommend that Wells Fargo's motion (#89) for summary judgment be granted as to each of Blocker's claims in this action, and denied as to Wells Fargo's counterclaim for prevailing defendant fees pursuant to 42 U.S.C. §1988(b). Each of Blocker's claims should be dismissed with prejudice. All pending motions should be denied as moot, and a final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Page 24 - FINDINGS AND RECOMMENDATION

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

Dated this 23rd day of November, 2010.

Honorable Paul Papak
United States Magistrate Judge